IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>DEREK JARVIS</td><td></td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>Civil Action No. DKC 07-3385</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>ENTERPRISE FLEET SERVICES</td><td></td><td></td></tr>
<tr><td>AND LEASING COMPANY</td><td>:</td><td></td></tr>
</table>

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination action are: (1) a motion for default judgment filed by Plaintiff Derek Jarvis (paper 94), (2) Plaintiff's motion for judgment on the pleadings (paper 147), (3) Plaintiff's motion for reconsideration of an order awarding attorneys' fees and costs in favor of Defendant Enterprise Fleet Services and Leasing Company (paper 177), (4) Defendant's motion for summary judgment (paper 190), (5) Plaintiff's cross-motion for summary judgment (paper 192), (6) Defendant's motion for sanctions (paper 111), and (7) Defendant's motion for prefiling injunction (paper 169). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiff's motions for default judgment, judgment on the pleadings, reconsideration, and summary judgment will be denied;

Defendant's motion for summary judgment will be granted, and its motions for sanctions and prefiling injunction will be denied.

I.   **Background**

   A.   **Factual Background**

   The following facts are uncontroverted, unless otherwise indicated.   Plaintiff Derek Jarvis, an African-American male, was hired as a part-time driver in the "Fleet Services" division of Defendant Enterprise Leasing Company ("Enterprise") on June 27, 2000.   He held the same position until he was discharged on April 19, 2007.   Throughout Plaintiff's employment, Enterprise was a Maryland corporation engaged in the business of renting, leasing, and selling automobiles; the Fleet Services division leased and managed cars for companies that maintained corporate fleets.[1]   As a Fleet Services driver, Plaintiff's duties included delivering vehicles to customers, picking up and dropping off vehicles at service stations, driving "chase" vehicles to return other drivers to Enterprise, and having vehicles inspected.

   Plaintiff was initially paid at a rate of seven dollars per hour.   Over the course of his employment, he received four separate fifty-cent raises – on July 27, 2002, March 18, 2003,

---

[1] Enterprise has since undergone a corporate reorganization in which it was re-named Enterprise RAC Company of Maryland, LLC.   It is now a Delaware limited liability company and a wholly-owned subsidiary of Enterprise Holdings, Inc., a Missouri corporation.   Its former Fleet Services division is now known as Fleet Management.

May 24, 2004, and June 1, 2006 – ultimately resulting in a wage of nine dollars per hour.  The same summer that Plaintiff was hired, Enterprise hired three other part-time Fleet Services drivers, two of whom were Caucasian and started at the same pay rate as Plaintiff.  The third driver was African-American and received an initial pay rate of seven dollars and fifty-cents per hour.  As of March 2006, Fleet Services employed approximately thirteen drivers:  three were African-American, nine were Caucasian, and one was Asian-American.  All of these drivers worked on a part-time basis and their hourly wage ranged from $7.50 to $9.25.  From April 2002 until the date of his discharge, Plaintiff was paid at either the highest or second highest rate of any other Fleet Services driver and generally was assigned the same or more number of hours per week.

Throughout Plaintiff's employment, Enterprise maintained policies and procedures prohibiting race discrimination, harassment, and retaliation.  These policies were updated annually and all employees were required to acknowledge their receipt of these updates in writing.  When complaints arose in the workplace, Enterprise implemented a procedure by which a supervisor would first investigate the complaint, then meet with the parties involved to discuss his or her findings and take corrective action.  These steps were typically memorialized by

written memoranda referring to the relevant policies implicated, which both the employees and supervisor signed and dated.  These memoranda, written complaints and responses, and other investigatory documents were maintained by Enterprise in employee personnel files.

Plaintiff's personnel file reflects that a large number of complaints were lodged by or against him during his tenure at Enterprise.  Many of these related to petty disputes between Plaintiff and Caucasian Fleet Services drivers.  Among these was a February 2001 incident in which Plaintiff complained that driver Erwin DeHaven was "abusive with language" during an argument with a vendor employee and was "belligerent" toward Plaintiff when he "tried to defuse the situation."  (Paper 190, Ex. 7 at ENT2003).  In response, Enterprise conducted an investigation and issued a written memorandum to Plaintiff advising of its finding that he had also "used inappropriate language towards Mr. DeHaven in front of [a vendor's] customers and employees" during the same incident.  (*Id*. at ENT2040-41). Both men were counseled and reminded of relevant company policies.  Several months later, Plaintiff filed a complaint alleging that another driver, Robert Lomax, said to him during an argument, "just get in the car, boy."  (*Id*. at ENT2080-82). The ensuing investigation revealed that Plaintiff had used

4

inappropriate language and threatened physical harm to Mr. Lomax during that incident. Again, both men were counseled. In July 2002, Plaintiff was involved in another incident with Mr. DeHaven, who allegedly said to him, "you people are always slow," "I don't like working around you people," and "I'm not used to working around black people." (*Id.* at ENT2095). Mr. DeHaven denied making those statements. By his account, during an argument regarding a work assignment, Plaintiff accused him of "being a racist" and "threatened to 'flatten' [him] then and there." (*Id.* at ENT2093). Both men were issued counseling memoranda.

A number of complaints were filed by Fleet Services drivers related to Plaintiff's allegedly wreckless driving and insistence on playing offensive radio programming while other drivers were in the car. (Paper 190, Ex. 7 at ENT2040-41; Ex. 8 at ENT1303). Other drivers complained that Plaintiff engaged in personal pursuits, such as dining and shopping, while on company time. (Paper 190, Ex. 5 at ¶¶ 15, 24; Ex. 9 at ¶ 5). In July 2001, driver Stephen Peck filed a complaint indicating that he was having difficulty working with Plaintiff due in part to Plaintiff repeatedly stating his intent to sue Enterprise and obtain a money judgment, as he had succeeded in doing against

other companies in the past.   (Paper 190, Ex. 7 at ENT2083-85).[2]
Other drivers and outside business associates later made similar
reports.

Plaintiff was also involved in a number of conflicts with
third-party vendors and customers with whom he came into
contact.   On or about October 1, 2002, he filed a written
complaint stating that a mechanic at "Shady Grove Texaco," a
service station with which Enterprise conducted business,
threatened "to run [him] over if [he] didn't move," and said
"something else that sounded derogatory tho[ugh] [Plaintiff]
couldn't make it out exactly."   (*Id*. at ENT2160).   In September
2004, a female representative of "T. Furr," a corporate
customer, complained to Enterprise that Plaintiff had made
suggestive comments about her appearance.   When questioned about
the incident, Plaintiff claimed that he was being "unfairly
singled out" and expressed his desire to have no more contact
with the customer.   (*Id*. at ENT2199).   On November 30, 2006,
Plaintiff was involved in an incident with a Maryland State
Police Officer at a Department of Motor Vehicles ("DMV")

---

[2] It bears mention that during the pendency of this lawsuit
Plaintiff concomitantly prosecuted four other law suits against
businesses in this court alone.   *See Jarvis v. FedEx Office &
Print Servs., Inc.* (DKC-08-1694); *Jarvis, et al. v. Grady
Management, Inc.* (PJM-09-0280); *Jarvis v. Geico Insurance Co.*
(RWT-09-2638); and *Jarvis v. Staples, Inc.* (PJM-10-0244).   The
record references a number of other suits that are apparently
pending in other courts.

location in Glen Burnie, Maryland.   He subsequently filed a written complaint with the Maryland Department of Motor Vehicles claiming that the officer became "hostile and belligerent" when Plaintiff asked him why he served a "Hispanic customer" ahead of Plaintiff, adding that the "Corporal's conduct made me feel he had racist motives." (*Id.* at ENT2514-15).   In February 2007, Plaintiff accused an employee of "Trick Trucks," another corporate customer, of making a "homosexual comment" toward him when the employee jokingly referred to Plaintiff, who was delivering a check, as "the check fairy." (Paper 190, Ex. 5 at ¶ 40).   Again, with respect to these complaints involving outside business associates, Enterprise conducted an investigation and took steps to address the issues it identified, which included limiting Plaintiff's contact with the businesses about which he complained.

Plaintiff was additionally cited by Enterprise for a number of incidents of general misconduct over the course of his employment.   In April 2001, he was placed on probation for violating Enterprise's cell phone policy by charging $215.63 in personal phone calls.   (*Id.* at ENT2078-79).   In April 2002, he was counseled for improperly expensing lunches to Enterprise. (Paper 190, Ex. 5 at ¶ 13).   In October 2002, he received counseling related to an incident in which he failed to report

ripping the hose from a gas pump at a service station.  (Paper 190, Ex. 8 at ENT1307).   In November 2006, Plaintiff's direct supervisor, Gene Lippa, approached Plaintiff regarding his apparent failure to clock out immediately after completing his shift, to which Plaintiff responded by asking, "Who put you up to this?" (Paper 190, Ex. 7 at ENT2539-40).

Despite these issues, Plaintiff received generally favorable performance reviews for much of the time he was employed by Enterprise.  From 2001 to 2005, he received overall performance ratings of "meets requirements" and positive comments from his supervisors, who identified Plaintiff as a "'go to' guy when things need to get done," and cited "positive feedback from several customers" related to his work.  (Paper 192, Ex. 4).   In these reviews, Plaintiff also commented positively about his relationship with Mr. Lippa, whom he identified as "fair and easy to work with" and an "excellent supervisor." (*Id.*).

Among the earliest complaints of racially-motivated conduct made by Plaintiff occurred in October 2004 when Plaintiff advised Mr. Lippa that his vehicle had been vandalized in the Enterprise parking lot the day before, indicating his suspicion "that maybe an employee at Enterprise, possibly one of the drivers, singled him out because of not liking him personally or

due to racism." (Paper 190, Ex. 7 at ENT2202). Upon Plaintiff's request, Mr. Lippa inspected the vehicle and reported finding only "a small paint chip that could have come from a rock hitting it." Nevertheless, he advised Plaintiff that "if he felt that he was being targeted by someone from Enterprise, he should take this matter to our Human Resources Department." (*Id.*). Plaintiff declined to do so, however.

According to Enterprise, by 2005, Plaintiff had made a number of requests that he not be assigned to work with various drivers, customers, and business associates with whom he had conflicts. Mr. Lippa responded by modifying Plaintiff's job responsibilities so that he could work alone, primarily by completing assignments at local DMV locations. Plaintiff was also permitted to report to work at a later time than drivers in the regular rotation. This arrangement appeared to work well in the early going. Starting in or around 2006, however, Plaintiff registered a number of complaints regarding his work assignments at DMV locations and refused to accept any assignment at the District of Columbia DMV.

At around the same time, Enterprise developed concerns about Plaintiff's work efficiency, as supervisors observed that he often took longer than expected to complete tasks in the field. Specifically, they noted that when Plaintiff was

9

assigned a DMV-related task in Virginia, he regularly bypassed the nearest DMV location and travelled instead to the Fair Oaks Mall DMV, in Fairfax, Virginia, which was located inside a shopping mall.    In June 2006, while Plaintiff's regular supervisor, Mr. Lippa, was away on vacation, Traffic Supervisor Melanie Reynard assumed responsibility for making driver assignments.    She became concerned when, on two consecutive days, Plaintiff took longer than expected to complete tasks at the Fair Oaks Mall DMV.    She met with Plaintiff the following day, along with Tag and Title Supervisor Gabe Kelly, to discuss the issue.    After Plaintiff provided an explanation for the delays, Mr. Kelly and Ms. Reynard assigned him a task at a DMV location in Sterling, Virginia, specifically instructing him not to go to the Fair Oaks Mall location.    After this meeting was adjourned, but before leaving for the assignment, Plaintiff returned to Mr. Kelly's office and alleged that he was being "singled out" due to racism.   (Paper 190 at Ex. 10, ¶ 8).   He threatened to sue Enterprise, claiming he would "take the Company down" and "own Enterprise" as a result.    When the supervisors attempted to assure Plaintiff that their concerns were merely about efficiency, Plaintiff became increasingly agitated, stating loudly, "this is bullshit."    (*Id.*).  Thereafter, he proceeded to the Fair Oaks Mall DMV, as he had

been explicitly instructed not to do.  (Paper 190, Ex. 9 at ¶ 12; Ex. 10 at ¶ 10).

The following week, Plaintiff had another conflict with Ms. Reynard.  She assigned him a task to complete at a DMV location in Frederick, Maryland, but upon his return, he submitted a DMV document that appeared to have been stamped by the DMV office in Glen Burnie.  Ms. Reynard suspected that Plaintiff had again disregarded her instructions, and Plaintiff grew indignant when she confronted him.  Ms. Reynard later learned that she was mistaken.  (Paper 190, Ex. 9 at ¶¶ 14-15).

Because of Plaintiff's allegations of workplace discrimination, Human Resources Manager Megan Trimm was notified and Enterprise's procedures for investigating such claims were invoked.  On June 28, 2006, Plaintiff met with Ms. Trimm, Ms. Reynard, and Fleet Services Controller Matt Dowd to discuss the recent issues related to his conduct, as well as his discrimination claims.  During this meeting, Plaintiff produced a six-page letter alleging that he was being "targeted" and "harassed," and threatening "that a lawsuit would be filed if this pattern continued."  (Paper 190, Ex. 7 at ENT2232-37). Plaintiff was placed on a paid two-day suspension.  (Paper 190,

Ex. 13, at ENT10281).[3]   The following Monday, when Plaintiff was to report back to work, he advised that he would not work that day because Mr. Lippa would again be away and he refused to be managed by Ms. Reynard and Mr. Kelly.   Enterprise permitted Plaintiff to take a third day of paid leave.  (*Id.* at ENT2265).

Thereafter, Plaintiff began submitting a long succession of letters to Enterprise alleging race discrimination, harassment, and repeatedly threatening to file a lawsuit unless Enterprise met certain demands, such as providing him with a company vehicle and a gas card.   On July 7, 2006, Ms. Trimm met with Plaintiff to discuss her investigation into the issues he raised during the prior meeting, as well as those raised in his subsequent letters.   Plaintiff responded with a letter disputing Mr. Kelly's account of their prior encounter, characterizing it as "[a]nother feeble and misguided attempt by Mr. Kelly[] to put me in a negative light."   He further alleged that Ms. Reynard had attempted to "[s]abotage" him by accusing him of going to the Glen Burnie rather than Frederick DMV location.  (*Id.* at Ex. 7, ENT2352-53).   On July 11, he submitted another letter contending that Ms. Trimm had subjected him to a "grueling" interview, raising new allegations of harassment by certain

---

[3]   This was the action that constituted the basis of Plaintiff's initial administrative complaint.   Enterprise asserts that this was neither a suspension nor an adverse employment action.

third-party vendors, and offering to work as a "[l]ia[i]son between H.R. and minorities." (*Id.* at ENT2394-97). In a letter dated July 17, Plaintiff complained that his work hours had been reduced since the investigation of his complaints began and stated a number of demands, including a fifty thousand dollar salary as compensation for "[d]iscrimination, [h]arassment and [b]ias," "a (6) figure amount[] [i]n [d]amages," a company vehicle, and a gas card. (*Id.* at ENT2407-08).

On the same date, Ms. Trimm issued a written memorandum describing the steps she took to investigate Plaintiff's complaints, indicating that she found no evidence of harassment or discrimination. (*Id.* at ENT2400-02). With regard to Plaintiff's complaint about reduced work hours, she cited records reflecting that he was the only Fleet Services driver scheduled to work five days per week during that time period and that he had been assigned more hours than many other drivers. Plaintiff responded with a letter alleging that Ms. Trimm's investigation was "biased" (*id.* at ENT2415-19), and followed-up with another letter reiterating his desire to work in the Human Resources Department (*id.* at ENT2420-2425). In a July 31 letter, Plaintiff alleged that Ms. Trimm displayed a "[c]ondescending, [d]emeaning attitude," that he felt as if he had "walked [i]n on a KKK [m]eeting, [i]nstead of a meeting in

the H.R. Office," and restated his demands for a lucrative settlement.  (*Id.* at ENT2436-39).

On July 24, 2006, Mr. Lippa conducted Plaintiff's annual performance review, which indicated that Plaintiff "required improvement" in "[k]eep[ing] management informed of progress" and "[a]ccept[ing] verbal and written instructions."  Although Plaintiff again received an overall assessment of "meets requirements," this review included comments such as "[y]ou have recently shown resistance to inquiries regarding your productivity," and "[y]ou recently displayed an unwarranted outburst in the workplace after being asked questions about your productivity."  (Paper 192, Ex. 10 at ENT1086-87).  Plaintiff refused to sign the review and subsequently submitted a written response alleging that it was the product of "[d]ark [s]ources within Corporate who [w]ish[] to [d]estroy [him]."  (Paper 190, Ex. 7 at ENT2426-29).

At around this time, due to Plaintiff's allegations against his immediate supervisors and Ms. Trimm, upper management personnel at Fleet Services became involved in investigating his claims.  On August 4, 2006, Fleet Services Vice President Scott Lease and Group Human Resources Manager Kristina Stuber met with Plaintiff to discuss his allegations.  During this meeting, Ms. Stuber memorialized Plaintiff's remarks and afterward sent

14

Plaintiff a memorandum assuring that she would investigate the issues he raised during the meeting.  Plaintiff responded with a letter asserting widespread allegations of racism throughout Enterprise.  (*Id*. at ENT2441-45).  In a detailed memorandum dated October 4, 2006, Ms. Stuber responded to each of the concerns raised by Plaintiff, advised him of the steps she took to investigate, and informed him that she was unable to find any evidence that he had been the victim of discrimination or harassment.  (*Id*. at ENT2491-2500).  Plaintiff responded with an eleven-page letter addressed to the Montgomery County Office of Human Rights – which, by this time, was investigating his first administrative complaint – alleging, *inter alia*, that Ms. Stuber told him she did not think the term "boy" was offensive and that Ms. Trimm was a "Slave-Driver" who "didn't care for [b]lack [p]eople." (*Id*. at ENT2516-26).

Meanwhile, Ms. Stuber's investigation into Plaintiff's most recent allegations was ongoing.  Upon reviewing Plaintiff's time records and Mr. Lippa's investigations of Plaintiff's complaints regarding third-party business associates, she again found no evidence suggesting that Plaintiff had been the victim of discrimination.  Nevertheless, on December 6, 2006, Enterprise sent a memorandum to more than one hundred fifty Fleet Services vendors, customers, and partners reiterating its "commitment to

15

conducting business professionally and ensuring all persons
equal treatment without regard to any protected characteristics,
such as race, and asking that they do the same." (Paper 190, ¶
59; Ex. 8 at ENT2543).

On or about January 4, 2007, Ms. Stuber responded in
writing to allegations raised by Plaintiff in his initial
administrative complaint, advising him of Enterprise's position
that it took appropriate steps to investigate his claims.  This
memorandum further advised that because the investigation found
no evidence that an employee or third-party business associate
had engaged in unlawful conduct, Plaintiff would be returned to
the regular driver rotation.[4]  (Paper 190, Ex. 7 at ENT2544-46).
Plaintiff responded the next day with a letter claiming that Ms.
Stuber's investigation was "trivial and false," asserting his
intent to file a lawsuit against third-party vendors,
reiterating that he would sue Enterprise if a settlement was not
reached, and stating that he was no longer willing to discuss
his complaint with Enterprise and would not sign any documents
Enterprise presented, as he anticipated litigation.  (*Id*. at
ENT2547-49).  During a meeting with Mr. Lippa on the same day,

---

[4]   Enterprise asserts that it had been contemplating
returning Plaintiff to the regular driver rotation for some
time, as it had become increasingly difficult to find
assignments that Plaintiff was willing to perform without
decreasing his assigned hours.  Plaintiff deems this action a
demotion.

Plaintiff expressed his objection to being returned to the regular driver rotation and advised that he was unwilling to report to work at the earlier starting time required for that job. (*Id.* at ENT2552). Several days later, Plaintiff sent a letter alleging that Mr. Lippa was "devising a scheme" to terminate Plaintiff's employment and had "exhibited . . . racial animus" toward African-American men. (*Id.* at ENT2553-55).

On January 12, 2007, Enterprise received another letter from Plaintiff that concomitantly alleged harassment by Mr. Lippa and expressed a desire to continue working as his "assistant." (*Id.* at ENT2556-59). Plaintiff additionally complained that "[m]any of the driver[]s refused to work with [him]," advised that he had "personal and professional commitments that would make it extremely difficult" to arrive at work before 9:00 a.m., and requested that he be permitted to report to either Ms. Stuber or Paul McKenzie, another supervisor. (*Id.*). Ms. Stuber responded, by letter dated January 19, presenting Plaintiff with the option of either returning to "the regular scheduling and task assignment rotation as other drivers," thereby receiving "at least the same number of hours per week," or continuing to work with Mr. Lippa, as he had been doing, for fewer hours per week. (*Id.* at 2568). On January 19, 2007, Plaintiff responded by accusing Ms. Stuber

17

of "targeting" him, characterizing the options she presented as "pressure tactic[]s." (*Id.* at ENT2570-74).

On January 23, 2007, Ms. Stuber and Mr. Lippa met with Plaintiff to address his latest allegations. During this meeting, Plaintiff "raised his hand in Mr. Lippa's face several times when Mr. Lippa tried to speak, saying he did not want to hear anything Mr. Lippa had to say." (Paper 190, Ex. 5 at ¶ 38). The following day, Ms. Stuber issued a formal reprimand to Plaintiff related to his conduct toward Mr. Lippa. (*Id.* at ENT2578-79). Plaintiff responded by accusing Ms. Stuber of racial discrimination, stating that he "no longer want[ed] to discuss these [i]ssue[]s" with her. (*Id.* at ENT2581-86).

In a memorandum dated March 5, 2007, Ms. Stuber again reprimanded Plaintiff, this time for disclosing to other drivers confidential pay information that he had obtained as a result of the administrative proceeding. This memorandum further stated that several drivers had registered complaints about Plaintiff repeatedly stating his intent to "sue Enterprise and collect a large sum of money." (Paper 190, ¶ 71; Ex. 7 at ENT2597-98). The next day, during a meeting with Mr. Lippa and Ms. Reynard, Plaintiff became agitated, used profanity, and stormed out. (Paper 190, Ex. 5 at ¶ 42; Ex. 9 at ¶ 27).

On March 13, 2007, Ms. Stuber received a letter from Plaintiff asserting that the drivers who complained about him had fabricated their reports and outlining a series of incidents with drivers, which he claimed reflected racial bias. (*Id.* at ENT2600-06; Ex. 2 at ¶ 35).  During a meeting the following day, Plaintiff told Ms. Stuber that an employee named "Kahn" at a service station in Tysons Corner, Virginia, had told him "to 'watch his back' because the other drivers hated him and he feared for his safety." (Paper 190, Ex. 2 at ¶ 35).  Ms. Stuber subsequently interviewed "Kahn," who denied making those comments, but advised that Plaintiff had repeatedly told him about his plans to sue Enterprise. (*Id.* at ENT2631-32).

Around this time, Enterprise issued its policy manual for the 2007 calendar year, which contained an acknowledgment form that all employees were required to sign.  Plaintiff refused to sign the form.  (Paper 190, Ex. 3 at ENT2620).  Mr. Lease subsequently issued a memorandum informing Plaintiff that he would be suspended if he did not return the executed form by a certain date.  (Paper 190, Ex. 7 at ENT2616).  Plaintiff complied only after Enterprise demonstrated that he had signed the same form on a number of occasions over the course of his employment.  (Paper 190, Ex. 2 at ¶ 34).

In March 2007, an incident occurred in which Plaintiff picked up a vehicle from a customer and delivered it to an Enterprise lot, noting in an assignment log that the customer had given him two sets of keys, but turning in only one set to Enterprise. When another employee found this vehicle idling in the lot with the second set of keys in the ignition, Ms. Reynard questioned Plaintiff, who responded by alleging that she was attempting to "set him up." (Paper 190, Ex. 9 at ¶ 28). Plaintiff followed-up with a March 23 letter in which he claimed that Mr. Lippa and Ms. Reynard were racists (paper 190, Ex. 7 at ENT2624-26); a March 28 letter alleging that Ms. Reynard was attempting to "sabotage" him by having another driver take the keys and start the vehicle (*id.* at ENT2628-30); and an April 13 letter stating that he was no longer willing to work with certain Fleet Services drivers because they were "plotting against [him]" (*id.* at ENT2668-69).

On April 17, 2007, Ms. Stuber, Mr. Lease, Ms. Reynard, and Mr. Lippa met to discuss the findings of Ms. Stuber's latest investigation of Plaintiff's various complaints. At this meeting, the decision was made to terminate Plaintiff's employment. Plaintiff was discharged by Enterprise on April 19, 2007. (Paper 190, Ex. 7 at ENT2679-81).

20

B.    Procedural Background

On August 15, 2006, Plaintiff filed a complaint of alleged discrimination in employment with the Montgomery County Office of Human Rights ("MCOHR"), citing as its bases racial discrimination and retaliation. (Paper 190, Ex. 13 at ENT10003-04). On July 10, 2007, MCOHR issued a determination finding no reasonable grounds to believe that a violation of Montgomery County Code, Chapter 27, Article I, § 27-19 had occurred, summarizing its factual findings as follows:

> In brief, the facts show the Complainant wanted a raise to $10.00 an hour, he wanted to work alone with limited exposure to coworkers, he wanted to choose his supervisor and his own schedule, and he wanted to be able to refuse work assignments having to deal with parties he did not like. Investigation disclosed that in settings in which someone raised a concern about the Complainant or if he was displeased with someone, he would assert discrimination. However, he has provided no evidence to support any of his allegations.

(*Id.* at ENT10293).[5]   This complaint was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"),

_____

[5] The decision notes that Plaintiff submitted a total of seventeen "statements" to MCOHR: "Throughout these statements, [Plaintiff] asserted and re-asserted allegations against [Enterprise's] Fleet Services Division Management, [its] business partners and third party vendors, his co-workers, and finally the mediator, the [MC]OHR, and the [MC]OHR Investigator." (Paper 190, Ex. 13 at ENT10287). Plaintiff "accused the mediator [assigned by MCOHR] of being unethical, the [MC]OHR unprofessional, [and] the [MC]OHR Investigator

which advised Plaintiff of his right to sue on September 26, 2007.  (Paper 1, Ex. 1).

While Plaintiff's initial complaint was pending, he filed a second administrative complaint, this time with the Maryland Commission on Human Rights ("Maryland Commission"), reiterating his prior claims and alleging further incidents of race discrimination and retaliation, including his termination in April 2007.  (Paper 190, Ex. 14 at ENT11003).  In a written finding dated April 23, 2008, the Maryland Commission determined there was no probable cause to believe that unlawful discrimination had occurred.  (*Id*. at ENT11363-64).[6]  This complaint was also cross-filed with the EEOC, which issued a second right to sue letter on June 24, 2008.  (Paper 82, Ex. A).

On December 19, 2007, while his second administrative complaint was pending, Plaintiff, proceeding *pro se*, filed a complaint in this court alleging that Enterprise discriminated against him on the basis of race and unlawfully retaliated against him in response to his complaints of racial

---

biased for not conducting the investigation into his complaint allegations in a way he suggested." (*Id*. at ENT10288).  He additionally filed a complaint with the Maryland Bar against the MCOHR mediator.  (Paper 190, Ex. 4 at 331-36).

[6] At his deposition, Plaintiff claimed that the Maryland Commission's investigation was "bogus and falsified," and acknowledged that he had recently sent the Commission a letter threatening to file a suit seeking "millions" in damages if a settlement was not offered.  (Paper 190, Ex. 4 at 364).

discrimination in the workplace in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").  (Paper 1).  On February 13, 2009, upon obtaining leave from the court and with Enterprise's consent as to certain claims, Plaintiff filed a third amended complaint raising claims of retaliatory discharge and harassment in violation of Title VII and Md. Code Ann. Art. 49B, § 42, retaliation under Title VII, negligent training and supervision, and defamation.  (Paper 82).

## II.  Plaintiff's Motions for Default Judgment

The discovery process in this case, unfortunately, has been highly contentious and unnecessarily prolonged, due in large part to Plaintiff's filing of repetitive motions and interlocutory appeals from adverse rulings.  Many of these filings relate to Plaintiff's perception that Enterprise has tampered with certain documents it produced in response to his requests for production of documents and that it has impermissibly withheld others critical to prosecuting his claims.  Plaintiff now moves for entry of a default judgment as a sanction for this alleged misconduct.  (Paper 94).  Because this motion is based on arguments that have already been considered and rejected, it cannot prevail.

23

On March 31, 2008, Plaintiff filed a motion for sanctions alleging spoliation of documents produced by Enterprise in connection with the prior administrative proceedings. (Paper 22). That motion was followed, on April 14, by a second motion for sanctions in which Plaintiff cited additional evidence of spoliation. (Paper 30). On April 24, Plaintiff filed a motion to compel discovery, asserting that Enterprise had failed to respond to his numerous discovery requests. (Paper 31). On the same date, Enterprise moved for a protective order, arguing, *inter alia*, that Plaintiff's discovery requests were unduly burdensome and not in compliance with Fed.R.Civ.P. 33(a)(1) and Local Rule 104(1). (Paper 32). On May 29, Plaintiff filed a second motion to compel. (Paper 43). Magistrate Judge Day, to whom the case was referred for discovery and scheduling, held a hearing on all of these motions, among others, on June 5, 2008, and subsequently issued an order denying Plaintiff's motions and granting in part Enterprise's motion for protective order. (Paper 49).

On October 14, 2008, Plaintiff filed yet another motion to compel discovery, arguing that Enterprise's responses to his discovery requests were "evasive and incomplete." (Paper 67 at 1). After holding a telephone conference in an unsuccessful attempt to resolve this dispute, Judge Day issued a letter order

24

on February 17, 2009, denying Plaintiff's motion.   (Paper 84).

In that order, Judge Day "praise[d] Defendant's efforts to

comply with its discovery obligations," characterizing them as

"extensive and reasonable." (*Id*. at 2).   By contrast, the court

expressed concern as to the "foundations for Plaintiff's

Motion," adding that if not for Plaintiff's *pro se* status, he

would "quite easily be faced with a significant sanction of

attorney's fees having failed in his effort to compel discovery

in areas in which he is already in receipt of huge swaths of

information of only marginal relevance." (*Id*.).   Plaintiff

moved for reconsideration of this order (paper 86), but before

that motion could be decided, he filed the first of six

interlocutory appeals in this case (paper 91).[7]

---

[7] The Fourth Circuit dismissed this appeal, along with three
others consolidated with it, on August 4, 2009.   (Paper 171).
After the appellate court's mandate took effect, Judge Day
denied Plaintiff's motion for reconsideration.   (Paper 182).
    Notably, Plaintiff has alleged bias and/or judicial
misconduct on the part of both the undersigned and Judge Day
within this proceeding.   On June 11, 2009, he filed a motion for
recusal alleging "an inference of bias and prejudice against
this Plaintiff" because he had another case pending before this
court.   (Paper 120, at 1).   The court denied that motion and
Plaintiff appealed.   (Papers 125, 128).   On June 22, 2009,
Plaintiff moved for Judge Day to recuse himself.   (Paper 136).
That motion was also denied and Plaintiff again appealed.
(Papers 159, 164).   On or about February 3, 2010, this court
received correspondence from Plaintiff alleging, *inter alia*,
that Judge Day "has continuously engaged in harassment against
me," and that he "appears to be engaged in a 'witch hunt' . . .
[and] have a personal vendetta against me."   Plaintiff requests
that the undersigned, as the court's chief judge, reassign

While his appellate challenge was pending, Plaintiff filed the instant motion seeking entry of a default judgment against Enterprise as a sanction for its alleged failure to "provide material and probative evidence." (Paper 94 at 1).  Plaintiff contends that Enterprise's failure to produce the documents that were the subject of one or more of his prior motions to compel "authorizes the court to impose '[a] judgment of [d]efault against the disobedient party,'" under Fed.R.Civ.P. 37(c)(1). (*Id.* at 4).

Federal Rule of Civil Procedure 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Rule 37(b)(2)(A)(vi), in turn, authorizes entry of a default judgment as a sanction.  This is, however, "a harsh remedy to be used only in extreme situations, and then only when a court

---

another judge.  This *ex parte* request, however, is procedurally improper.

finds willfulness, bad faith, or any fault by the non-compliant litigant." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2nd Cir. 2009).

In the instant case, on at least two prior occasions, Judge Day has expressly found no fault on the part of Enterprise with respect to its responses to Plaintiff's discovery requests. Indeed, it is Plaintiff's requests that have been determined to be "overbroad and unreasonable." (Paper 84, at 5). The same documents at issue in this motion have been the subject of multiple rounds of briefing, a motions hearing, a telephone conference, a motion to reconsider, and an appeal. The same arguments raised by Plaintiff here have been considered and rejected before. The same result, therefore, will also obtain. Accordingly, Plaintiff's motion for default judgment will be denied.

### III. Plaintiff's Motion for Judgment on the Pleadings

Like his motion for default judgment, Plaintiff's motion for judgment on the pleadings (paper 147) is grounded in his unyielding belief that Enterprise has failed to meet its discovery obligations. While the nuances of Plaintiff's argument in this rambling and repetitive motion are often difficult to discern, the gravamen is that Enterprise "[is] and [has] been hiding and concealing material and probative evidence

in violation of Rule 26(a), and for that simple reason judgment should be granted in favor of this Plaintiff as a matter of law [u]nder Rule 12(c)." (*Id.* at 2). Just as he argued in the prior motion that he was entitled to entry of a default judgment as a sanction for this perceived misconduct, he contends here that he is "entitled to judgment on the pleadings as a sanction for the spoliation of evidence." (*Id.*). For many of the same reasons as his motion for default judgment, this motion will also fail.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Such motions are governed by the same standard governing motions to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). A court may grant judgment on the pleadings "only if it appears beyond doubt that the nonmoving party cannot prove any facts that would support his or her claim for relief, after it has accepted all well-pleaded allegations in the pleading as true, and drawn all reasonable inferences in favor of the nonmoving party." 2 Moore's Federal Practice, § 16.05 (3d ed. 2001).

Insofar as Plaintiff seeks relief under Fed.R.Civ.P. 12(c) as a sanction for the alleged spoliation of evidence by Enterprise, he has failed to cite any legal authority establishing that such relief is available under that rule, nor could he.  In fact, the case law he does cite with respect to this issue, *e.g.*, *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001), addresses the imposition of sanctions for spoliation of evidence under Fed.R.Civ.P. 37(b)(2).  Thus, this motion largely seeks to relitigate the same issues raised by Plaintiff in his motion for default judgment, which itself sought to rehash issues decided in prior discovery rulings.

The motion further asserts that "[t]here are no material facts in dispute" in this case and that Enterprise "cannot dispute 'smoking gun' evidence [that] Plaintiff has already provided the court in the form of exhibit(s) in the pleadings." (Paper 147, at 3).  The exhibits attached to Plaintiff's third amended complaint, however, are far from outcome determinative. They include a number of performance reviews, as well as a notice of benefit determination in which the Maryland Department of Labor, Licensing and Regulation ("DLLR") found that "[i]nsufficient evidence has been presented to show any misconduct in connection with the work." (Paper 82, Ex. B). Plaintiff's performance reviews may be read to reflect

Enterprise's increasing dissatisfaction with the quality of his work starting in or around 2006. According to Plaintiff, the 2006 review was the result of retaliation by Enterprise management in response to his reports of discrimination in the workplace. An alternative view, however, is clearly plausible. Moreover, the finding by DLLR that there was insufficient evidence of Plaintiff's misconduct is a far cry from a finding that Enterprise discriminated against him on the basis of race and retaliated against him for engaging in protected conduct. "Factual findings made in state unemployment claim proceedings receive no preclusive effect in actions brought under federal statutes despite involving the same operative facts." *Pettis v. House of Ruth Md., Inc.*, 144 Fed.Appx. 313, 315 (4th Cir. 2005) (unpublished) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 360 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)); *see also Univ. of Tennessee v. Elliott*, 478 U.S. 788, 794 (1986). Nevertheless, as the pleadings make clear, there are factual findings by other state administrative agencies – *i.e.*, the MCOHR and Maryland Commission – that are clearly adverse to Plaintiff's claims.

In sum, Plaintiff has failed by a wide margin to meet his burden with respect to this motion. Accordingly, his motion for judgment on the pleadings will be denied.

## IV. Plaintiff's Motion for Reconsideration

Plaintiff has moved for reconsideration of an order issued by Judge Day on August 19, 2009 (paper 174), awarding fees and costs associated with a prior motion to compel discovery filed by Enterprise. (Paper 177). While the motion is labeled as one for reconsideration, in substance, Plaintiff seeks this court's review of Judge Day's order, asking that it be set aside. So construed, Plaintiff's motion will be denied.

On October 29, 2008, in accordance with Local Rule 104.8(a), Enterprise served upon Plaintiff a motion to compel discovery, seeking supplemental answers to interrogatories and requests for production of documents. Plaintiff did not agree to provide the information sought in the motion, nor did he serve a memorandum in opposition within fourteen days, as required by Local Rule 104.8(c). (Paper 151, at 1). In three subsequent letters to Plaintiff, Enterprise addressed the issues raised in its motion to compel, but Plaintiff persisted in his refusal to provide additional discovery responses. (Paper 95, Ex. 3). On April 8, 2009, Enterprise filed a document entitled "Certificate Regarding Discovery Conference Related to

31

Defendant's Motion to Compel Plaintiff's Answers to Interrogatories and Requests for Production of Documents," attaching thereto its motion to compel discovery. (Paper 95). On the same date, Enterprise filed a separate motion to compel deposition and for sanctions, citing its repeated, unsuccessful attempts to take Plaintiff's deposition and seeking an order compelling Plaintiff to appear for deposition and an award of attorney's fees associated with the filing of the motion. (Paper 97). Plaintiff opposed both of these motions, characterizing Enterprise's attempts to procure his deposition and supplemental discovery responses as harassment. (Paper 106).

At a June 19, 2009, hearing on these motions, Judge Day orally granted the motion to compel discovery responses and directed counsel for Enterprise to submit an affidavit in support of an award of costs and fees incurred in connection with its motion. (Papers 131, 132; Paper 151, ¶ 4).[8] Shortly thereafter, Enterprise submitted an affidavit requesting an award of fees and costs of $2,319.14. (Paper 151). Plaintiff filed papers opposing the award on July 6, 2009. (Paper 155). On August 19, 2009, Judge Day issued a letter order awarding

---

[8] The court also granted in part Enterprise's motion to compel deposition, ordering that the deposition take place on July 17, 2009. (Paper 132). That order is not at issue here.

attorney's fees to Enterprise in the amount of $2,112.89. (Paper 174).  Two days later, Plaintiff filed the motion for reconsideration and to vacate Judge Day's order, which the court now considers.  (Paper 177).

Under 28 U.S.C. § 636(b)(1)(A), non-dispositive pretrial matters may be referred to a magistrate judge for hearing and determination.  A district judge may modify or set aside any portion of a magistrate judge's non-dispositive ruling "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  *Id.; see also* Fed.R.Civ.P. 72(a).  Under the clearly erroneous standard, the reviewing court is not to ask whether the finding is the best or only conclusion permissible based on the evidence.  Nor is it to substitute its own conclusions for that of the magistrate judge. *See Tri-Star Airlines, Inc. v. Willis Careen Corp.*, 75 F.Supp.2d 835, 839 (W.D.Tenn. 1999).  Rather, the court is only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence.  *Id.*  "It is not the function of objections to discovery rulings to allow wholesale relitigation of issues resolved by the magistrate judge." *Buchanan v. Consol. Stores Corp.*, 206 F.R.D. 123, 124 (D.Md. 2002).

33

In his motion, Plaintiff states that he "has no idea why he was sanctioned by Magistrate [J]udge Day, as Magistrate Day made inconsistent statements with respect to an award of fee[]s and sanctions against him."  (Paper 177, at 2).  "Initially," he explains, "Magistrate Day stated that Plaintiff would be sanctioned because he did not file a response to Defendant[']s Motion to Compel Interrogatories, which was not the case," but "later stated that Plaintiff would be sanctioned for 'dragging defendants into court.'"  (*Id.*).  In sum, Plaintiff argues in conclusory fashion that Judge Day "abused his discretion by making inconsistent statements in awarding sanctions and applied incorrect legal standards." (*Id.* at 3).

Judge Day's order makes clear, however, that he awarded attorney's fees and costs pursuant to Fed.R.Civ.P. 37(a)(5), which provides, in relevant part, that if a motion to compel discovery is granted, absent certain mitigating factors, "the court *must*, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed.R.Civ.P. 37(a)(5)(A) (emphasis added).  Plaintiff has failed altogether to address this point, although it is plainly stated in the order. Nevertheless, Judge Day's ruling was amply supported by the

record and was not clearly erroneous.  The record reflects that Enterprise made numerous good faith attempts to obtain supplemental discovery responses from Plaintiff regarding information that was clearly discoverable, and that when Plaintiff repeatedly refused to cooperate, Enterprise was left with no other recourse than to file its motion to compel. (Paper 95).  Plaintiff does not challenge the court's calculation of fees and costs, but asserts that he is "unemployed and indigent, and has no ability to pay sanctions," a fact of which "the Magistrate judge was well awar[e] before issuing this erroneous and biased order," and further suggests that the order was issued by Judge Day in retaliation for Plaintiff filing a motion for his recusal.  (Paper 177, at 7). There is no support in the record for these bare and conclusory allegations.  The court discerns no error of fact or law, nor an abuse of discretion in the magistrate judge's award of fees and costs.  Accordingly, Plaintiff's motion for reconsideration will be denied and judgment will be entered in favor of Enterprise in the amount of $2,112.89.

## V.  Motions for Summary Judgment

### A.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any

35

material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily

renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F .3d 529, 536 (4th Cir. 1997), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The inquiry involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252. Where the movant also bears the burden of proof on the claims at trial, it "must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation omitted),

*cert. denied*, 530 U.S. 1204 (2000); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation and italics omitted). Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted). Finally, in reviewing the instant motion, the court must remain mindful of Plaintiff's *pro se* status and the fact that pleadings filed by such litigants are generally held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972), *reh'g denied*, 405 U.S. 948 (1972).

## B. Analysis

Several preliminary issues must be addressed with respect to the motion papers before the court. First, although Plaintiff has labeled his papers as a cross-motion for summary judgment, in substance, they merely oppose Enterprise's motion

and cannot be construed otherwise.    Thus, Plaintiff's cross-motion for summary judgment will be denied.

It also must be noted that there is considerable disparity in the quality of the evidence submitted by the parties.    While Enterprise has presented voluminous records, deposition excerpts, and a number of declarations of relevant witnesses in support of its claims, Plaintiff relies principally upon his own "affidavits."    These "affidavits" are problematic in several respects.    Initially, they are unsworn and do not include the language required by 28 U.S.C. § 1746 for unsworn declarations. "An affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath." *Farm Bureau Mut. Auto Ins. Co. v. Hammer*, 83 F.Supp. 383, 386 (D.W.D.), *rev'd. on other grounds*, 177 F.2d 793 (4th Cir. 1949).    Affidavits are admissible in summary judgment proceedings only if "they are made under penalties of perjury," and "unsworn documents purporting to be affidavits may be rejected." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (citing 28 U.S.C. § 1746; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 n.16 (1970)); *see also Solis v. Prince George's County*, 153 F.Supp.2d 793, 798 (D.Md. 2001) ("[u]nsworn statements do not qualify as affidavits and are not considered by the Court when ruling on a motion for summary judgment").    Furthermore,

39

Plaintiff's purported affidavits largely, if not exclusively, assert conclusory allegations that are unsupported by any other evidence. Federal Rule of Civil Procedure 56(e)(1) provides, in relevant part, that "[a] supporting or opposing affidavit must be made on personal knowledge, set out in facts that would be admissible in evidence." A party opposing a summary judgment motion, moreover, is not permitted to "rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). Here, Plaintiff has not provided a proper affidavit in support of his opposition papers. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) (bald allegations of discrimination are insufficient to counter substantial evidence of legitimate, non-discriminatory reasons for adverse employment action). Consequently, he has offered little to rebut the substantial evidence presented by Enterprise in support of its motion.[9]

---

[9] The remaining documents provided by Plaintiff consist largely of personnel records for various Enterprise employees, which Plaintiff has grouped together and improperly labeled as the "declarations" of these employees. He has also failed to explain the relevance of many of his exhibits and, in many cases, it is unclear how they support the proposition for which they appear to be cited.

1.   **Retaliation (Counts I and III)**

In the first count of his third amended complaint, labeled "Retaliatory Discharge," Plaintiff alleges that his termination "was motivated by Enterprise'[s] desire to retaliate against him for his having filed a charge of discrimination against Enterprise, in August 2006," in violation of Title VII and Md. Code, Art. 49B.[10]   (Paper 82, at 18).   This count further alleges, however, that Enterprise's "discriminatory and abusive acts against [him], including suspension without cause . . . constitute [u]nlawful retaliation." (*Id*. at 19).   The third count of the complaint, labeled "Retaliation," appears to be duplicative of the first.   The court construes the first and third counts as alleging that Enterprise retaliated against Plaintiff for engaging in protected conduct by terminating his employment, in August 2007, and by suspending him with pay for two days, in June 2006.

---

[10]   Plaintiff was granted leave, in part, to amend his complaint to add counts alleging violations of Md. Code Ann., Art. 49B, § 42.   (Paper 80).   While he generally cites Article 49B under two counts of his third amended complaint, omitting the relevant section, his motion papers present no analysis of his claims under this provision.   Nevertheless, the analysis is substantially similar to that under Title VII.   *See Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482 n.8 (2007) ("Title VII is the federal analog to Art. 49B of the Maryland Code").

### a.   Retaliatory Discharge

Enterprise contends that it is entitled to summary judgment on this claim because Plaintiff cannot establish a *prima facie* case of retaliatory discharge and, even if he could, he cannot establish that Enterprise's justification for terminating his employment was pretext for discrimination. In opposing, Plaintiff appears to argue that the timing of his termination alone, approximately eight months after he filed his first administrative complaint with the MCOHR, is sufficient to defeat Enterprise's motion. (Paper 192, at 47).

In order to survive summary judgment on this claim, Plaintiff must establish a *prima facie* case of retaliatory discharge by offering evidence from which a reasonable jury could find that (1) he engaged in a protected activity, (2) his employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. *See Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 754 (4th Cir.), *cert. denied*, 519 U.S. 818 (1996). Once Plaintiff establishes a *prima facie* case, the burden shifts to Enterprise to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action, *see Williams*, 871 F.2d at 457, after which the burden shifts back to Plaintiff to produce evidence that Enterprise's proffered reason

42

was a pretext for intentional discrimination, *see Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002).

Plaintiff has arguably made out a *prima facie* case of retaliatory discharge. The filing of his complaint with MCOHR was clearly a protected activity; his discharge was an adverse employment action; and the "temporal proximity" between these two events may be sufficient to establish a causal nexus. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994). However, "mere knowledge on the part of an employer that an employee . . . has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons" for the adverse employment action. *Williams*, 871 F.2d at 457. Plaintiff has proffered no evidence to contradict the clear demonstration in the record that Enterprise's non-discriminatory reasons for terminating his employment were legitimate.

In an April 18, 2007, memorandum advising Plaintiff of its decision to discontinue his employment, Enterprise cited Plaintiff's unwillingness to comport himself "in a manner that is conducive to a positive, productive working relationship" as its reason for discharging him, identifying the following six areas of general concern:

> 1. You regularly have failed to respond in
>    a positive or constructive manner to

43

questioning or feedback and have
demonstrated ongoing insubordinate
conduct toward management. . . .

2.   You have demonstrated an inability to
get along with your co-workers. . . .

3.   You have engaged in a persistent
pattern of accusing anyone who does
not agree with you of racism where
there are no facts to establish that
race was an issue. . . .

4.   You have shown an ongoing unwillingness
to follow management directives or
take on the same work
responsibilities as other drivers. . .
.

5.   You have repeatedly bad-mouthed and
disparaged Enterprise and Enterprise
management to co-workers and outside
vendors. . . . [and]

6.   You have lodged complaints that have no
factual basis.

(Paper 190, Ex. 7 at ENT2679-81).   Within these areas, the

memorandum provided a number of specific examples.   In support

of its motion for summary judgment, moreover, Enterprise has

provided extensive documentation of these examples.

In *Khoury v. Meserve*, 268 F.Supp.2d 600, 615 (D.Md. 2003),

this court considered similar factual circumstances:

Plaintiff's only "evidence" that Defendant's
reason for terminating her was a pretext for
intentional discrimination is her insistence
that the reason Defendant stated was wrong-
*i.e.*, that Plaintiff did not make false
statements, etc. There is no evidence,
however, that Defendant's reason was not the

44

real reason, *i.e.*, that the agency did not believe that Plaintiff lied when it terminated her employment. This court's task is not to sit, in this context, as a super personnel agency. It is not enough for Plaintiff to allege pretext based on her own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is to proffer evidence showing that Defendant's stated reason was not the real reason for its actions. Plaintiff has proffered no such evidence and Defendant's motion for summary judgment will therefore be granted.

The instant plaintiff, like the plaintiff in *Khoury*, has failed to proffer any evidence aside from his own conclusory allegations that his former employer's stated reasons for terminating his employment were pretext for discrimination. *See Nichols v. Comcast Cablevision of Md.*, 84 F.Supp.2d 642, 651 (D.Md. 2000) ("bald allegations" are "insufficient to counter substantial evidence of legitimate, non-discriminatory reasons for adverse employment action") (citing *Williams*, 871 F.2d at 456). Accordingly, summary judgment as to this claim will be granted in favor of Enterprise.

**b.    Retaliatory Suspension**

Plaintiff also asserts that Enterprise retaliated against him in response to his initial complaint of racial discrimination by suspending him with pay for two days in June 2006. As noted, Enterprise denies that this was a suspension, asserting that Plaintiff was merely placed on two days of paid

leave to allow Ms. Trimm time to investigate his allegations. Even if it was a suspension, Enterprise argues, it was not a "materially adverse" employment action sufficient to form the basis of a *prima facie* case of retaliation. The court agrees.

In *Grice v. Baltimore County, Md.*, Civ. No. JFM 07-1701, 2008 WL 4849322, *7-8 (D.Md. Nov. 5, 2008), Judge Motz considered a similar issue:

> Defendant argues that a suspension with pay cannot constitute an adverse employment action. The Supreme Court recently explained that the standard for showing an adverse employment action in the retaliation context is less strenuous than in the substantive discrimination context. *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Nonetheless, the Court emphasized that the action must produce a material consequence for the employee, as opposed to "trivial harms." *Id.* at 68. The "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*
>
> Several courts, including some post-*Burlington Northern*, have held that "a suspension with pay pending a prompt investigation into allegations of wrong-doing does not constitute an adverse employment action." *Solomon v. Phila. Newspapers, Inc.*, No. 05-05326, 2008 U.S. Dist. LEXIS 41978, at *49, 2008 WL 2221856 (E.D.Pa. May 21, 2008); *see also Scott v. Metro. Health Corp.*, 234 Fed. Appx. 341, 349 (6th Cir. 2007) (finding that placing an employee on paid administrative leave was

not a materially adverse employment action for purposes of a retaliation claim); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891-92 (8th Cir. 2005) (concluding that a suspension with pay and benefits for eighty-nine days did not constitute an adverse action for retaliation purposes); *Helmi v. Solvay Pharms.*, Inc., No. 5:05-CV-36, 2006 U.S. Dist. LEXIS 84562, at -40, 2006 WL 3392758 (W.D.Mich. Nov. 21, 2006) (finding that a two-day suspension with pay did not constitute an adverse employment action for retaliation purposes).

Grice's February 2007 paid leave was such a suspension. Grice was put on paid leave in "an effort to defuse the situation until [Grice's supervisor, Keith Dorsey, Deputy Director of Budget & Finance] had had an opportunity to investigate further" the complaints made by Grice's co-workers against Grice. (Def.'s Mem., Ex. 7.) The present case is distinguishable from *Burlington Northern*, in which a thirty-seven day suspension without pay that was later rescinded was found to be materially adverse. 548 U.S. at 70. The Court's finding in *Burlington Northern* was based on the conclusion that "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* at 72. Grice maintained her salary during her suspension and thus was not subjected to this "serious hardship." Grice has not shown that she has suffered an adverse employment action.

Here, whether termed a "suspension" or otherwise, it is undisputed that Plaintiff was placed on two days of paid leave after verbally complaining that he was being "targeted" and threatening to sue, then presenting Enterprise with a handwritten, six-page document asserting multiple claims of

47

racial discrimination. Under the reasoning of *Grice*, and the cases cited therein, this was clearly not a materially adverse employment action, and thus could not form the basis of a retaliation claim. Nevertheless, because Plaintiff has submitted no competent evidence suggesting that Enterprise's legitimate, non-discriminatory reason was pretext for discrimination, this claim cannot survive summary judgment.

**2. Racial Discrimination and Hostile Work Environment (Count II)**

The second count of Plaintiff's complaint, labeled "Harassment," alleges that Enterprise "subjected [him] to a continuous pattern of harassment," as set forth in the factual portion of the complaint. (Paper 82, at 20). Plaintiff further alleges that Enterprise "maintained a pattern and practice of unlawful discriminatory practices against Plaintiff on account of his race." (*Id.*). Thus, the court construes Plaintiff's generalized "harassment" claim as alleging discrimination on the basis of race and hostile work environment in violation of Title VII.

**a. Racial Discrimination**

There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting

scheme set forth by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Here, Plaintiff has produced no direct evidence of discrimination. Therefore, he must proceed under the *McDonnell Douglas* burden-shifting framework. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, the presumption of discrimination raised by the plaintiff's *prima facie* case is rebutted. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10). The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the end, however, "[t]he plaintiff always bears the ultimate burden

49

of proving that the employer intentionally discriminated against [him]." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

### i. Wage Discrimination

Plaintiff asserts that Enterprise discriminated against him on the basis of race by paying him at a rate lower than it paid Caucasian employees for the same work.   To establish a *prima facie* case of wage discrimination under Title VII, Plaintiff must prove that (1) he is a member of a protected class, (2) he was paid less than an employee outside the class, and (3) the higher paid employee was performing a substantially similar job. *See Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F.Supp.2d 637, 644 (D.Md. 2004).   The undisputed evidence establishes that Plaintiff, an African-American male, was compensated at a lower rate than one other Fleet Services driver – Robert Brown, a Caucasian – among approximately thirteen total drivers, for a portion of the time he was employed by Enterprise.   Thus, Plaintiff has demonstrated a *prima facie* case with respect to this claim.

Enterprise has responded, however, with legitimate, non-discriminatory reasons for this disparity.   Pay records demonstrate that from the time Mr. Brown was hired, in July 2003, until January 2005, he was paid at a rate lower than or

equal to that of Plaintiff.  (Paper 193, Ex. 19).  The record further reflects that Mr. Brown earned a raise in 2005 based on his exemplary performance record, and that, in April 2006, he bargained for another raise by threatening to leave Enterprise for a better paying job.  (Paper 193, Ex. 20 at ¶ 8).  *See Kess*, 319 F.Supp.2d at 645 (finding salary negotiation a legitimate, non-discriminatory reason for salary disparity).  With the exception of Mr. Brown, Plaintiff was paid at the same or higher rate than any other Caucasian driver from April 2002 through April 2006.  *See Gray v. Newlan*, 917 F.2d 557, 1990 WL 169224, *4 (4th Cir. 1990) (Table) (where black plaintiff was paid less than one other white employee but more than several others, it "reduce[d] the force of the argument charging discrimination").

Plaintiff has failed to establish that the evidence advanced by Enterprise is pretext for discrimination.  He baldly alleges that Mr. Brown "was a significant problem while he was employed at 'Enterprise,' as [he] intimidated and threatened other driver[s] in fleet services and received many complaint[]s from customers and other 'Enterprise' employee[]s during his employment." (Paper 192 at 20).  Even assuming this is true, however, it does nothing to rebut the reasons advanced by Enterprise for the pay disparity, namely, that Mr. Brown had a strong performance record and bargained for a raise.

51

Considering also that for the last five years of his employment Plaintiff earned more than all other similarly-situated Caucasian drivers, this claim must fail.

### ii. Discrimination by Reducing Pay, Reducing Assigned Hours, and Changing Work Assignments

Plaintiff also argues that Enterprise discriminated against him by reducing his pay "significantly throughout [his] tenure" at Enterprise. (Paper 192, at 15). While the basis of this argument is unclear, he appears to allege that Enterprise reduced his hours after he began filing his numerous complaints in 2006, thereby reducing his income. He further asserts that Enterprise engaged in discrimination by changing his job description, assigning him tasks that other drivers refused to accept; by having him work alone, thereby isolating him from his co-workers; and by returning him to the regular driver rotation after it found no basis for his numerous complaints of discrimination.

The record reflects, however, that Plaintiff's hourly wage was never reduced; in fact, he received four separate raises over the course of his employment. Moreover, Enterprise has presented pay records demonstrating that Plaintiff's work hours generally increased over the course of his employment, as did his yearly income. In 2006, the year in which Plaintiff contends his work hours were reduced, he worked a total of

52

1,355.95 hours, the highest total of any year of his employment, thereby earning the highest salary. (Paper 193, Ex. 19 at ¶¶ 6, 9; Tabs B and C). Moreover, for the period from January 1, 2006, through March 31, 2007 – the time period in which Plaintiff filed his internal complaints with Enterprise and his first administrative complaint with MCOHR – he had the third highest average weekly hours of any Fleet Services driver, and the only two drivers who worked more than him were both African-American. (Paper 193, Ex. 19 at ¶ 11; Tab F).

Insofar as Plaintiff alleges that Enterprise discriminated against him by changing his work assignments and assigning him unwanted tasks, "[t]he mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). Reassignment of duties is not actionable absent "a decrease in compensation, job title, level of responsibility, or opportunity for promotion." *James*, 368 F.3d at 376 (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).

Enterprise asserts, and the record supports, that by 2005 there were a number of other drivers and third-party vendors with whom Plaintiff had reported conflicts and/or requested not to work. In response, Mr. Lippa attempted to limit Plaintiff's

exposure to individuals with whom Plaintiff had reported having conflicts, assigning him tasks that he could perform alone, such as DMV assignments. Enterprise contends that Plaintiff welcomed this change, as it permitted him to report to work at a later hour and removed him from situations in which he might otherwise experience harassment. Although Plaintiff now disputes this point, he cannot dispute that when Enterprise attempted to return him to the regular driver rotation he protested vociferously and asked to continue working as Mr. Lippa's "assistant." (Paper 190, Ex. 7 at ENT2556).[11]

Plaintiff now complains that Mr. Lippa "began to isolate [him] from certain co-worker[]s whom he knew engaged in [discriminatory] conduct and isolated Plaintiff away from third-party vendor[]s which severely altered the conditions of Plaintiff's employment." (Paper 192, at 29). He further asserts, however, that when Enterprise returned him to the regular driver rotation, its intent was "to place him into a hostile environment with white fleet driver[]s whom Plaintiff filed complaint[]s against for racial harassment." (*Id*. at 37).

---

[11] This letter, written by Plaintiff and addressed to Ms. Stuber, significantly undermines several of Plaintiff's claims. In it, he states, "My schedule and job duties[] never changed as a result of [y]our so-called [i]nvestigation, or my suspension last July 2006. I have worked as assistant to [i]mmediate supervisor Mr. Gene Lippa[] for well over (2) year[]s, and my schedule [h]as never changed, which again [i]s (9:00am – 3:30 pm)." (Paper 190, Ex. 7 at ENT2556).

In sum, Plaintiff's argument appears to boil down to the following: (1) that Enterprise failed to address his complaints of racial harassment in the workplace; (2) that when it attempted to limit his exposure to this alleged harassment, *i.e.*, respond to his complaints, it discriminated against him by isolating him from his alleged harassers; and (3) that when Enterprise returned him to the regular driver rotation, it again subjected him to the hostile work environment from which he had previously been unlawfully isolated.   Thus, Plaintiff presents Enterprise with a Hobson's choice of Title VII violations.   His claims in this regard are at least self-contradictory, if not frivolous.

Plaintiff has failed to make a *prima facie* showing that Enterprise discriminated against him by reducing his pay or reducing his hours.   He has additionally failed to demonstrate that the legitimate, non-discriminatory reasons asserted by Enterprise for changing his work assignments were pretext for discrimination.   Accordingly, summary judgment will be granted with respect to these claims.

### iii. Failure to Promote

Plaintiff next contends that Enterprise discriminated against him by failing to promote him to a full-time and/or management position.   He further asserts that Enterprise

routinely promoted Caucasian drivers to such positions, often without announcing such positions to potential minority applicants, while it relegated black employees to "low level wage positions without advancement." (Paper 192, at 30).

To establish a *prima facie* case of disparate treatment for failure to promote, Plaintiff must show (1) that he applied for a position, (2) that he was qualified for that position, and (3) that he was denied the position under circumstances giving rise to an inference of discrimination. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). Plaintiff has failed to make a *prima facie* showing here because he has not identified a single position for which he applied. In fact, Enterprise asserts that Plaintiff was offered a full-time position, with a raise, which he declined to accept. Enterprise has also presented evidence demonstrating that during the course of Plaintiff's employment, only one part-time Fleet Services driver – Mark Winston, an African-American – was promoted to a full-time position. (Paper 190, Ex. 2 at ¶ 46). Plaintiff has offered no evidence in rebuttal. Accordingly, this claim cannot survive summary judgment.

### b.   Hostile Work Environment

Plaintiff further alleges that he was subjected to a hostile work environment on the basis of his race in violation

of Title VII.    To survive summary judgment on his hostile work environment claim, Plaintiff must show that a reasonable jury could find that he was the subject of conduct that was: "(1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004).

Plaintiff must demonstrate that "but for" his race, he "would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (internal marks and citation omitted).    To constitute actionable harassment, moreover, the discriminatory conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment" to a reasonable employee. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).    Accusations of "rude treatment" or "callous behavior" are insufficient to establish a hostile work environment claim. *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006).    Nor is mere speculation as to racial animus legally sufficient. *See Sonpon v. Grafton School, Inc.*, 181 F.Supp.2d 494, 500 (D.Md. 2002).    Where there is no direct evidence that the allegedly offensive conduct was based on race, a plaintiff may show that he was treated differently than

similarly situated employees on the basis of race.  *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007).  "[U]nsupported, conclusory statements that the plaintiff was treated differently because of [his] race," however, "are insufficient to defeat summary judgment."  *Lauture v. St. Agnes Hosp.*, Civ. No. CCB-08-943, 2009 WL 5166253, *7 (D.Md. Dec. 29, 2009) (citing *Gilliam*, 474 F.3d at 142, and *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2002)).

Here, Plaintiff has presented no evidence demonstrating that the conduct about which he complains was racially motivated.  While his "affidavits" are replete with allegations that other Fleet Services drivers, third-party vendors, and/or customers used racial epithets in his presence, those documents have no evidentiary value.[12]  The record unquestionably reflects that conflicts among Fleet Services drivers regularly arose, but there is nothing suggesting that these conflicts were based on race or created a racially hostile atmosphere.  As Plaintiff

---

[12]  It should be noted, moreover, that there is evidence suggesting that Plaintiff has embellished his accounts of these incidents over time.  For example, in his initial written report of the incident with the mechanic at "Shady Grove Texaco," Plaintiff claimed the mechanic threatened "to run [him] over if [he] didn't move," and said "something else that sounded derogatory tho[ugh] [he] couldn't make it out exactly."  (Paper 190, Ex. 7 at ENT2160).  He now claims that the mechanic "referr[ed] to [him] as 'Nigger!' and 'Boy!" (paper 192, at 30), and "ran [him] over with a pick-up truck at the station" (Paper 192, Plain. Aff. at ¶ 67).

acknowledges, even "[t]he white [F]leet driver[]s did not get along with each other and constantly argued among themselves." (*Id.* at 28). Plaintiff contends that after he lodged his internal complaint with Enterprise, human resources personnel "harassed" him by "interrogat[ing]" him about his claims "in an effort to confuse the issues and ignore the discrimination." (Paper 192, at 16). Even assuming this was harassment rather than an attempt to investigate his complaints, there is nothing to suggest that a racial motive was involved. Plaintiff also baldly asserts that his supervisors "fabricated" memoranda regarding his conduct in an effort to "sabotage" his employment. Assuming this were true, however, the only indication in the record that they did so because of race is found in the speculative assertions of Plaintiffs "affidavits." As noted, "unsupported speculation is insufficient to carry [the] burden in opposing summary judgment." *Sonpon*, 181 F.Supp.2d at 500.

In sum, Plaintiff has presented insufficient evidence establishing that the unwanted harassment that he allegedly experienced at Enterprise was based on race, nor can he establish that such conduct was so severe or pervasive as to alter the conditions of his employment and create an abusive atmosphere. Moreover, the record demonstrates that Enterprise diligently investigated his numerous complaints and took

reasonable steps to address his concerns, and there is no basis for imputing liability to Enterprise. *See generally Pagana-Fay v. Washington Suburban Sanitary Com'n*, 797 F.Supp. 462, 470 (D.Md. 1992) (no liability where "the evidence indicates that the matter was carefully investigated by proper representatives"). Accordingly, Plaintiff's hostile environment claim will not survive summary judgment.

### 3.   Negligent Training and Supervision (Count X)[13]

Along with his Title VII action, Plaintiff filed a claim against Enterprise for negligent training and supervision. In order to prove a cause of action for negligent hiring and supervision under Maryland law, Plaintiff must establish:

> that his injury was caused by the tortious conduct of [an employee], that the employer knew or should have known by the exercise of diligence and reasonable care that the [employee] was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries.

*Bryant v. Better Business Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 751 (D.Md. 1996).

Plaintiff has failed to address the relevant considerations with regard to this claim. It appears, in fact, that his intent

---

[13]   The remaining counts, the tenth and fifteenth of Plaintiff's amended complaint, are numbered out of sequence.

in raising it was to impute liability to Enterprise for the
Title VII violations of its employees.  He argues, "[t]he act(s)
by 'Enterprise['s]' supervisor(s) and employee[]s were all
committed under the scope of employment, [thus] liability for
negligent supervision which is the case at hand is imposed under
the theory of respondeat superior."    (Paper 192, at 49).
Plaintiff confirmed at his deposition that this claim was based
solely on his allegations of racial discrimination under Title
VII.  (Paper 190, Ex. 4 at 221-23).  As this court explained in
*Ladson v. Thompson*, Civ. No. DKC 03-1685, 2003 WL 22889793, *6
(D.Md. Dec. 3, 2003):

> "Title VII may not form the predicate for
> claims of negligent retention and
> supervision" because such claims are
> "preempted by the Maryland Worker's
> Compensation Act [MWCA], Md. Code Ann.,
> Labor & Employ. Art, § 9-501 *et seq.*" *Demby*
> *v. Preston Trucking Co., Inc.*, 961 F.Supp.
> 873, 881-82 (D.Md. 1997).  Indeed, the MWCA
> "provides the exclusive remedy for employee
> injuries arising out of and in the course of
> employment."  *Hart v. Harbor Court Assoc.*,
> 46 F.Supp.2d 441, 444 n.4 (D.Md. 1999).
> Thus, Plaintiff's claim for negligent
> hiring, supervision and retention – arising
> out of her Title VII action – must fail.

For precisely the same reason, the instant plaintiff's claim
must also fail.  Accordingly, summary judgment will be granted
as to this claim.

61

### 4.   Defamation (Count XV)

The fifteenth count of Plaintiff's third amended complaint alleges that "Defendants[] Gene Lippa, Melanie Reynard, Scott Lease, Matt Dowd, Kristina Stuber, and GM Michelle Boshe, conspired against the Plaintiff, and falsified memos with respect to incidents out in the field involving [] Plaintiff." (Paper 82, at 30).  He further seeks to hold these "Defendants" accountable for the alleged racial epithets of his co-workers and business associates.

To present a *prima facie* case of defamation under Maryland law, Plaintiff must establish four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm."  *Offen v. Brenner*, 402 Md. 191, 198 (2007).  Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 5-105, such a claim must be raised within one year of the date the allegedly defamatory statement was made.

Here, the parties who allegedly committed these defamatory acts are not named as defendants.  Assuming, *arguendo*, that the acts of these employees, if proven, could be imputed to Enterprise, Plaintiff's claim would nevertheless be barred by the statute of limitations.  While he fails to identify the

62

dates on which the allegedly defamatory statements were made, they clearly occurred prior to his discharge date in April 2007. Plaintiff filed his motion for leave to file a third amended complaint, seeking to add the defamation count, on September 15, 2008. (Paper 55). Because he did not seek to add this count until well over one year after the latest date that a defamatory act could have occurred, Plaintiff's defamation claim is time barred. Accordingly, summary judgment will be granted in favor of Enterprise.

## VI. Enterprise's Motions for Sanctions and Prefiling Injunction

As the foregoing makes clear, Enterprise has been unduly burdened throughout the protracted discovery phase of this litigation by Plaintiff's vexatious and repetitive filings and/or unwillingness to comply with his discovery obligations. At various points, it has sought the court's intervention in attempt to stem the tide. Indeed, in the order accompanying this opinion, the court will enter judgment in favor of Enterprise in the amount of $2,112.89, representing fees it incurred in relation to litigating a motion to compel discovery. While the amount of that award undoubtedly pales in comparison to the expense associated with defending this action, it likely represents a substantial amount to Plaintiff, who is presently unemployed and indigent.

Two similar motions filed by Enterprise – a Rule 11 motion for sanctions (paper 111)[14] and a motion for prefiling injunction (paper 169) – are still pending.  Both of these motions will be denied.

Enterprise's motion for sanctions relates to Plaintiff's filing of a motion for default judgment (paper 94), which sought entry of a default judgment, pursuant to Fed.R.Civ.P. 37(c)(1) and 37(b)(2)(A)(vi), against Enterprise as a sanction for its alleged refusal to provide certain discovery documents that Plaintiff felt were critical to prosecuting his claims.  As noted, *supra*, Plaintiff's motion for default judgment will be denied because it seeks to relitigate issues decided adversely to Plaintiff's interests in various prior discovery motions.  Enterprise now contends that the motion was frivolous, unsupported by law, and designed to harass, delay, and increase costs.  While that may be the case, Fed.R.Civ.P. 11(d) provides that "[t]his rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37."  Thus, Rule 11 "is not applicable in this case because it expressly does not apply to discovery disputes." *Ausherman v. Bank of America Corp.*, 212 F.Supp.2d 435, 442 (D.Md. 2002).

---

[14] This motion was prematurely considered by Judge Day in an order that has since been rescinded.  (Papers 200, 201).

64

Enterprise additionally seeks a prefiling injunction enjoining Plaintiff, absent leave from the court, from filing "any further pleadings in the present action, including filing notices of appeal from this Court's Orders, and . . . any related actions against Enterprise." (Paper 169, at 1). Because the order accompanying this opinion will close the case, this motion will be denied as moot insofar as it requests relief in this action. Inasmuch as the order requests that Plaintiff be enjoined from filing future, related actions against Enterprise, the doctrines of *res judicata* and collateral estoppel provide adequate protection.

The court will take this opportunity, however, to issue a stern warning to Plaintiff that continuing his current pattern of filing frivolous lawsuits in this court, and vexatious filings within those suits, may well result in action from the collective bench, including requiring him to seek leave of the court prior to commencing any future lawsuit here. While the court would be hesitant to resort to such a measure, particularly in the case of a *pro se* litigant, the All Writs Act, 28 U.S.C. § 1651(a) provides it "the authority to limit access to the courts by vexatious and repetitive litigants." *Cromer v. Kraft Foods North Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004). Plaintiff is hereby placed on notice that the court

will not continue to tolerate the practices he has demonstrated in the instant case.  He is further advised to proceed with extreme caution in the cases he now has pending and in any future cases he may choose to pursue in this court.

## VII. Conclusion

For the foregoing reasons, Plaintiff's motions for default judgment, judgment on the pleadings, reconsideration, and summary judgment will be denied.  Enterprise's motion for summary judgment will be granted, and its motions for sanctions and prefiling injunction will be denied.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

66